UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

DVL, INC.,

                              Plaintiff,

       -against-                                           1:07-CV-1075 (LEK/DRH)

GENERAL ELECTRIC COMPANY,
NIAGRA MOHAWK POWER
CORPORATION, NATIONAL GRID
USA SERVICE COMPANY, INC.,
NATIONAL GRID USA, and
NATIONAL GRID,

                              Defendants.

## MEMORANDUM-DECISION AND ORDER[1]

## I.      INTRODUCTION

       Plaintiff DVL, Inc. ("DVL") brought this action against Defendants Niagra Mohawk Power

Corporation ("NMPC"), National Grid USA Service Company, National Grid USA, and National

Grid (collectively with NMPC, "Niagra Mohawk Defendants") and General Electric Company

("GE") under the Comprehensive Environmental Response Compensation and Liability Act

("CERCLA"), 42 U.S.C. § 9601 *et seq.*, and the New York State common law of indemnification,

trespass, and nuisance.  Compl. (Dkt. No. 1).  DVL seeks injunctive relief, as well as costs and

damages that it has expended or will incur in responding to the release and/or threatened release of

hazardous wastes on a DVL-owned property.  Id.

       Presently before the Court are DVL's Motion for partial summary judgment (Dkt. No. 40);

GE's Motion for summary judgment (Dkt. No. 38) and Cross-Motion to strike certain testimony

(Dkt. No. 52); and the Niagra Mohawk Defendants' Motion for summary judgment (Dkt. No 44).

---

[1] For printed publication in the Federal Reporter.

For the reasons that follow, DVL's Motion for partial summary judgment is denied, and GE's

Motion for summary judgment and Cross-Motion to strike are granted, as is the Niagra Mohawk

Defendants' Motion for summary judgment.

## II.    BACKGROUND

### A. Factual History

Plaintiff DVL is a corporation organized under Delaware law with a principal place of

business in New York State.  Compl. ¶ 5.  It is engaged in the ownership and operation of

commercial real estate properties throughout the United States.  Id. ¶ 6.  Among DVL's holdings is

a property located at 354 Upper Broadway (State Route 4), Fort Edward, New York (the "subject

property" or "DVL Site ").  Id. ¶ 13.  The DVL Site, which DVL acquired from Fort Edwards

Associates[2] by foreclosure in 2002 for a purchase price of $500,000, is bounded by Upper

Broadway, Gates Avenue, Burgoyne Avenue, and Ethan Allen Street.  Carames Decl. (Dkt. No. 40-

11) ¶¶ 8-9, Abdulla Aff., Ex. C ("Carames Dep.") (Dkt. No. 44-4) at 20-21.  Prior to DVL's

acquisition of the subject property, Fort Edwards Associates leased the site to the Grand Union

Company, which operated a supermarket there; prior to that, the subject property housed a scrap or

salvage yard known as the "Caputo Garage."  Carames Decl.¶ 9; Compl. ¶ 15.  At the time that DVL

acquired the subject property, the soil contained quantities of Polychlorinated biphenyls ("PCBs").

DVL did not know of this fact prior to its acquisition of the subject property and did not inquire or

otherwise investigate the environmental condition of that property before purchasing it.  Carames

---

[2]  DVL was the general partner for Fort Edwards Associates, Abdulla Aff., Ex. C ("Carames Dep.") (Dkt. No. 44-4) at 6:7-8.

2

Decl. ¶ 10; Carames Dep. at 19:18-23.

Since the mid-1940s, Defendant GE has owned and operated a manufacturing plant in Fort Edward, New York on Upper Broadway (the "GE Property"), which is nearly adjacent to the DVL Site.  Prevost Decl. (Dkt. No. 38-12) ¶ 5; GE Answer (Dkt. No. 24) ¶ 20.  The GE Property sits approximately 50 yards north of the DVL Site and on the other side of Upper Broadway.  Prevost Decl. (Dkt. No. 38-12) ¶ 5.  Ground water flows due south from the GE Property.  West Dep. (Dkt. No. 38-11) 59:15-16.

GE manufactures capacitors and other electrical components on the GE Property and had used PCBs there.  GE Answer ¶ 21; West Dep. at (Dkt. No. 38-11) 19:13-14, 22:14-17, 33:16-23. Although GE stopped using PCB oils at the Fort Edward Facility in June 1977, PCB fluids are still present in the surface soil and subsurface of the GE Property.  West Dep. at 25:6-23, 26:1:13.  PCBs were also used at GE's Hudson Falls site, approximately one mile from the GE Property.  Id. at 36:23, 37:1.  The two predominant types of PCBs used at both facilities were Aroclor 1242 and Aroclor 1254.  Id. at 38:22; 39:5.

GE has never owned or operated any portion of the DVL Site.  GE Answer ¶ 59.  GE insists that it has "never generated, stored, disposed of or arranged for disposal of any hazardous substances and/or wastes (including, without limitation, PCBs) on the DVL site," and it asserts that there is no evidence in the record to the contrary.  Id. ¶ 60; GE's Disc. Resp. to DVL Interrog. No. 11 (Dkt. No. 38-7); see also West Dep. at 65-66.  DVL admits that it "has never observed any GE capacitors on the DVL property."  DVL Resp. SOMF (Dkt. No. 53-1) ¶ A17.

Pursuant to a consent order between GE and New York State Department of Environmental Conservation ("DEC"), GE has taken remedial measures to investigate and address the PCB

3

contamination on the GE Property.  West Dep. at 40-41; see also Jensen v. Gen. Elec. Co., 82

N.Y.2d 77, 81 (1993).[3]  Those measures included the installation of collection systems and the

removal of contaminated soil.  West. Dep. at 41-46.  In 1996, GE also set up two monitoring wells

on the DVL property as part of a remedial investigation at the request of DEC; the wells were

installed to help determine whether there was any migration of contamination from the GE Property

to property to the east side of Broadway, including the DVL Site.  West Dep. at 58-59.  They have

always sampled negative for PCBs.  Carames Dep. (Dkt. No. 38-10) 145:24-25.

     Defendant NMPC provides electrical service in the Fort Edwards area.  Other investor

owned utilities and a number of smaller municipal utilities are interspersed and/or immediately

adjacent to the service territory of NMPC.  Reynolds Aff. (Dkt. No. 63-2) ¶ 6.  NMPC previously

employed "commonly used" distribution line transformers that contained Aroclor 1260, a PCB also

found in hydraulic fluids, de-dusting agents, as well as a plasticizer, and reinforcing agent.  Niagra

Mohawk SOMF ¶¶ 81-82; Reynolds Aff. ¶ 7; Castle Aff. (Dkt. No. 63-1) ¶ 4.  It purchased these

transformers from a variety of manufacturers, though mostly from GE and Westinghouse.  Castle

Aff. ¶ 4.  Niagra Mohawk SOMF ¶¶ 81-82; Reynolds Aff. ¶ 7.  Because the transformers came from

multiple sources and had no distinctive markings denoting Niagra Mohawk ownership, NMPC

contends that the only way to visually determine such ownership is by comparing serial numbers

assigned to each transformer to NMPC property records.  Castle Aff. ¶ 9.

     NMPC's records identify only a single vendor, M. Wallace Son, Inc. ("Wallace"), that is

---

[3] General Electric disposed of hazardous waste from its Fort Edward-Hudson Falls plant
from 1958 to 1969.  It entered into a consent order with DEC in 1980 under which it agree to
investigate environmental impacts and to undertake remediation at seven inactive hazardous waste
sites (the "seven sites").  82 N.Y.2d at 81.

known to have obtained retired transformers from NMPC's Eastern Division during the relevant period.  See generally Abdullah Aff., Wallace Dep., Sterge Dep., Ex. J (Dkt. No. 44-5).  Sidney Wallace identified three sites where transformer shells were shipped after being stripped at his facility in Cobbleskill, New York; the Caputo garage was not one of the three identified sites. Abdullah Aff., Wallace Dep., Ex. J (Dkt. No. 44-5) at 100.  The Wallace Site was itself identified as a hazardous waste site by the State of New York, and NMPC paid costs associated with its remediation.  Niagra Mohawk Defs.' SOMF ¶¶ 105-07.

In 2003, the DEC raised concerns over possible contamination at the Upper Broadway Barrel Site in Fort Edward, New York, an area containing the DVL Site.  Carames Decl. ¶ 11.  The Upper Broadway site was identified as an area of concern in the early 1980s after groundwater samples were collected from residential wells as part of investigations being conducted for the GE Fort Edwards site - groundwater sampling had indicated the presence of PCBs.  See Abdulla Aff., Ex. K (Dkt. No. 46) ("DEC Report") at 1-5.  The resulting extensive geophysical investigation, was guided, in part, by three items of concerns raised in interviews with local residents:

> During the 1970s and 1980s, storm water that accumulated on the west side of Upper Broadway would be pumped over to the east side of Upper Broadway.  There is concern that the water pumped to the east side of Upper Broadway may have been contaminated by the GE site;

> The McDonald's and former Grand Union properties were reportedly used as an automobile repair business in the 1930s and 1940s, then later as a dealership in the 1940s and 1950s.  There are some concerns that a solvent pit was used to clean auto parts with spent solvents obtained from the GE plant . . .; and

> Finally, drums, allegedly from GE, were stored on site some time in the past.  The fate of the drums is unknown, and they may have been buried on site.

Id.

Between May 2003 and April 2004, Ecology and Environmental Engineering ("E&E"),

acting on behalf of DEC, conducted a preliminary site assessment ("PSA") of this area, alerting

DVL to possible contamination on its land.  Carames Decl. ¶ 11.  On or around August 27, 2004,

DEC advised DVL that the PSA revealed PCB contamination on the DVL Site.  Carames Decl. ¶¶

12-13; Carames Dep. at 49-50.  When the E&E/DEC final report was issued in October of 2004, see

DEC Report (Dkt. No. 46), it noted that PCBs were present at background (below-criteria) levels in

surface soils, storm water sediments, storm sewer samples or groundwater samples, concluding that,

"[i]n general, only low levels of contamination are present at the Upper Broadway site . . . [and] are

likely not site related, but are commonly present in urban/industrial areas."  DEC Report at 4-1.

Certain "areas of concern" were noted, however, including a test pit located in the wooded section

southeast of the former Grand Union and another test pit on the northern end of the former Grand

Union property.  Id. at 3:21-22; 4-2.  Subsurface test pit samples in these areas revealed the presence

of PCBs, including Aroclors 1242, 1254, and 1260.  Id. at 3-24, G-40.  No PCBs were detected in

the groundwater samples.  Id. at 3-26.

Test pit excavations found tires, bricks, concrete debris, and metal debris, but no

transformers, electrical components, or buried drums.  DEC Report at 3-21, 4-2.  The DEC report

noted the source of the PCB contaminants, including Aroclors 1248, 1254, and 1260, as "unknown."

DEC Report at 3-19, 3-20, 4-1.  This finding was made despite the Report's being guided, in part,

by concerns regarding GE's role in the contamination.  Id. at 1-5.  None of the Niagra Mohawk

Defendants are mentioned in the Report as a potential source of contamination.

DVL retained the services of Malcolm Pirnie, Inc., an environmental consulting firm, which,

between 2004 and 2007, oversaw, managed, and conducted investigations of the DVL Site  to

determine the extent of contamination and remediate the contamination discovered through the DEC

investigation.  Carames Decl. ¶¶ 14-15, Carames Dep. 50:10-11.  Malcolm Pirnie prepared a work plan that was approved by DEC in September 2004.  Carames Dep. at 58.  Between 2004 and 2007, Bruce Nelson acted as Malcom Pirnie's project manager.  Nelson regularly communicated with DVL, which, in turn, regularly communicated with DEC, often through DEC's employee, James Ludlam.  Carames Decl. ¶¶ 15-16.

DVL paid for the costs and expenses related to the investigations conducted by Malcolm Pirnie, as well as for the excavation, removal, transport, and disposal of PCB-contaminated soil from the Site performed by SCL or Op-Tech, both remediation companies.  Carames Decl. ¶ 18; Carames Dep. at 56:7-23, 65:3-4.  DVL undertook investigations and remediation measures including soil sampling and removal.  These investigations and remediation activities occurred both prior to March 9, 2005, when DVL received a "no further concern action" letter regarding the site and subsequent to that date in relation to the potential sale of the property.  DVL Resp. SOMF ¶¶ 43-45; Carames Dep. at 54:3-7.  DVL never performed an investigation, nor did it hire anyone to conduct an investigation into the source of the PCBs at the Site.  Carames Dep. 100:15-21.

To date, the costs associated with these investigation and remediation activities is $1,065,396.18.  Carames Decl. ¶ 18.  DVL now seeks to recover these costs.  Compl.  Defendants, however, allege that the majority of DVL's expenses were incurred not as a result of being required by DEC to perform the clean-up.  Carames Dep. 70, 73:13-22.  Rather, Defendants argue that "the sole motivation for having this work done, this investigation done, and possible remediation done" was because DVL was in contract to sell the property.  Carames Dep. at 72:20-25, 73:1-8; see also GE SOMF (Dkt. No. 38-1) ¶ 3; Niagra Mohawk Defs.' SOMF ¶¶ 34-43.

Dennis Prevost, who grew up in Fort Edward, testified that, as a boy, he "personally

7

observed conditions" at the subject property.  He testifies that "[i]t is [his] understanding and knowledge that electrical capacitors were manufactured at the [GE Property] for more than 30 years . . . . and that such manufacturing included the use, handling and disposal of . . . PCBs."  Prevost Decl. ¶5.  During the 1960s Prevost recalls bicycling and "engag[ing] in youthful activities" on the DVL Site when the Caputo Garage was using the property for the salvage of vehicles, vehicle parts, and other equipment; he "observed large 'bucket' objects at the property.  These objects had markings which indicated that they had been owned by Niagara Mohawk Power Corporation.  Upon information, knowledge and belief, those 'bucket' objects were electrical transformers."  Prevost Decl. ¶¶ 6-7.  Prevost later clarified this observation, stating that as a young boy, he "observed bucket-type transformers with similar looking markings on utility poles in the area and observ[ed] one of these transformers being replaced in one instance by Niagra Mohawk . . . . I have no personal knowldge of the source of the transformers I observed on the [DVL] Site."  Abdulla Aff., Ex. E (Dkt. No. 44-4) ("Prevost Aff.") ¶ 4.  Prevost confirmed that the objects he remembers seeing on the DVL Site "did not bear Niagra Mohawk's name, initials or any other symbols or logos indicative of Niagra Mohawk ownership or sourcing."  Prevost Aff. ¶ 5 (Dkt. No. 44-4).

Prevost also recalls observing as a boy "the presence of [gray] objects which [he] understand[s] to be electrical capacitors at the present DVL Site."  Prevost Decl. ¶ 8.  The capacitors "bore no signs of wear and tear."  Prevost Aff. ¶ 9(c).  Prevost further recalls observing "soils or other fill material" being brought to the DVL Site, where they were used for road leveling and other development projects on that property.  Prevost Decl. ¶ 9.

**B.  Procedural History**

DVL initiated this action on October 11, 2007.  Compl.  GE and the Niagra Mohawk

8

Defendants filed Answers with Counterclaims and Cross-claims on February 4, 2008 and February

12, 2008, respectively.  Dkt. Nos. 24, 27.  A Uniform Pretrial Scheduling Order ("UPSO") issued on

March 19, 2008 set a discovery deadline of March 15, 2009 and required Plaintiff to identify experts

and serve the experts' written reports 90 days prior to that discovery deadline; Defendants were

ordered to do the same no later than 45 days prior to the March 15, 2009 date.  Dkt. No. 31 ¶ 6.  The

parties were ordered to identify all experts to be used to contradict opposing parties' expert

testimony and to provide those experts' written reports no later than 30 days from the discovery

deadline.  Id.  On December 2, 2008, the UPSO was amended, and the discovery deadline extended

to July 15, 2009.  Dkt. No. 35.  On July 22, 2009, over Defendants' objections, the Magistrate Judge

assigned to this matter granted Plaintiff's request for an additional extension of the discovery

deadline until to January 1, 2010, despite the fact that Plaintiff had "yet to serve responses to

outstanding written discovery demands from defendants and ha[d] not yet served expert witness

disclosures, essential in this case, although the deadline for such disclosures passed on or about

April 15, 2009."  Scheduling Order (Dkt. No. 37).

     On March 1, 2010, DVL filed its Motion for partial summary judgment ("DVL Motion")

(Dkt. No. 40) on the issues of GE and NMPC's liability to DVL pursuant to CERCLA and common

law indemnification principles for costs incurred by DVL in response to hazardous waste at the

DVL Site, see Mem. in Supp. of DVL Mot. (Dkt. No. 40-14) at 1; on the same day, GE filed a

Motion for summary judgment(Dkt. No 38) to dismiss all claims in the Complaint and all cross-

claims asserted against it, and the Niagra Mohawk Defendants filed a separate Motion for summary

judgment (Dkt. No. 44) to dismiss all claims in the Complaint against them.  As an attachment to its

Motion, DVL submitted the Declaration of James Ludlam ("Ludlam I"), an engineer employed by

DEC between 1977 and 2008, whose professional experience with DEC "included working on hazardous waste sites for which [GE] had either primary or sole responsibility . . . . [including] GE's Hudson Falls and Fort Edward Plants."  Ludlam I Decl. (Dkt. No. 40-12) ¶ 10.  DVL attached a Supplemental Declaration from Ludlam ("Ludlam II") with its filings in opposition to Defendants' Motions for summary judgment.  Ludlam II Decl. (Dkt. No. 53-2).

### III.    MOTION TO STRIKE

#### A. Advance Disclosure of Expert Witness' Identity and Written Reports

Federal Rule of Civil Procedure 26(a)(2)(A) requires a party to disclose "the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." FED. R. CIV. P. 26(a)(2)(A); see also FED. R. CIV. P. 26(e) (requiring parties to timely supplement Rule 26(a) disclosures); Lamere v. New York State Office for the Aging, No. 03-CV-0356, 2004 WL 1592669, at *1 (N.D.N.Y. July 14, 2004)("the identity of any witness who may be used to provide expert testimony, whether specifically retained for that purpose or not, must be disclosed."). Rule 26(a)(2)(B) requires the additional disclosure of "a written report – prepared and signed by the witness – if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony."  FED. R. CIV. P. 26(a)(2)(B); Lamere, 2004 WL 1592669, at *1; see also FED. R. CIV. P. 26, 1993 Advisory Committee Notes ("Paragraph [a](2)(B) requires that persons retained . . . to provide expert testimony . . . must prepare a detailed and complete written report . . . ").  Disclosures made pursuant to Rule 26(a) must be provided "at the times and in the sequence that the court orders." FED. R. CIV. P. 26(a)(2)(C).

Under Federal Rule of Civil Procedure 37(c), "[i]f a party fails to . . . identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that . . . witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37.  In determining whether preclusion is appropriate, a court must consider "(1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc., 118 F.3d 955, 961 (2d Cir. 1997) (citation omitted).

Rule 26(a)(2)(A) does not apply to lay witnesses, that is, those whose testimony is limited to "opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge . . . ." FED. R. EVID. 701. Where, however, the witness' testimony is based on scientific, technical, or other specialized knowledge, see FED. R. EVID. 702, the interplay between Rule 26(a)(2)'s mandatory disclosure and Rule 37(c)(1)'s prohibition on the use of untimely expert testimony, prevents the unfair "sandbagging" of adverse parties with new evidence.  Deluca v. Bank of Tokyo-Mitsubishi UFJ, Ltd., No. 06 Civ. 5474, 2008 WL 857492, at *12 (S.D.N.Y. Mar. 31, 2008)(citing Ebewo v. Martinez, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004)); see also Haas v. Delaware and Hudson Ry. Co., Inc., No. 1:04-CV-1503, 2007 WL 766324, at *2 (N.D.N.Y. Mar. 8, 2007) (Kahn, J.).  Because preclusion of evidence under Rule 37 is a "drastic remedy" courts recognize that it "should be exercised with caution."  Haas, 2007 WL 766324, at *2 (quoting Ventra v. United States, 121 F. Supp. 2d 326, 332 (S.D.N.Y. 2000)).

11

**B.   Declarations of James Ludlam**

On March 1, 2010, DVL filed its Motion for partial summary judgment and supplemented that Motion with a Declaration from James N. Ludlam, a long-term employee of DEC who worked on several hazardous waste sites contaminated with PCBs for which GE had primary or sole responsibility, and others on which NMPC was a party responsible for PCB contamination.  Ludlam I Decl. (Dkt. No. 40-12) ¶¶ 10, 15.  Ludlam states that through his work, he became familiar with State and Federal statutes and Rules and Regulations pertaining to the handling and disposal and investigation and remediation of hazardous waste disposal sites, as well as the requirements of the National Contingency Plain ("NCP") adopted pursuant to CERCLA.  Id. ¶ 8.

Ludlam's experience includes his working at the Fort Edwards Site where he was responsible for the review and approval of investigation and response activities.   Second Supplemental Ludlam Decl. (Dkt. No. 55-1) ("Ludlam III Declaration") ¶¶ 8-9.  Attached to its Memorandum in opposition to Defendants' Motions for summary judgment (Dkt. No. 53), DVL submitted a Supplemental Declaration from Mr. Ludlam.  Ludlam II Decl. (Dkt. No. 53-2).  Therein, Ludlam explains that "the purpose of this Supplemental Declaration is to respond to and clarify certain matters which (a) relate to DVL's compliance with the "National Contingency Plan" [] and (b) relate to the responsibility of the General electric Company [] and Niagra Mohawk Power Corporation . . . ."  Id. ¶ 6.

DVL had named Ludlam, who is not a party and has no interest in the outcome of the litigation, Ludlam I Decl. ¶ 2, as a potential lay witness, see Engle Decl., Ex. A, DVL Initial Disclosures (Dkt. No. 55), but had not identified him as an expert witness during the discovery period.  Ludlam was not retained nor specifically employed to provide expert testimony.  Ludlam III

12

Decl. ¶ 10.  Ludlam begins his Declarations by stating that he "ha[s] personal knowledge of the facts

set forth in this declaration."  Ludlam I Decl. ¶ 1; Ludlam II Decl. ¶ 1; see also Ludlam III Decl.

However, rather than provide lay opinions based on personal knowledge, Ludlam details his

education, expertise, and qualifications, and ultimately states conclusions that the presence of

certain Aroclor types found on the DVL Site indicate that they were of GE and Niagra Mohawk

origin.  Ludlam I Decl. ¶¶ 12-16.

Ludlam states that he is "familiar with GE's disposal practices with respect to PCBs and

PCB-containing wastes.  GE was responsible for the indiscriminate and widespread disposal of

PCBs and PCB wastes at locations in Washington, Warren, Saratoga and Rensselaer Counties."  Id.

¶ 13.  Ludlam states that his professional experience with DEC also made him familiar with

NMPC's disposal practices.  For example, he worked at the "Wallace" Site where "NMPC was

responsible for PCB contamination due to the disposal of electrical transformers which contained

PCB fluid."  Id. ¶ 15.  From that, Ludlam became aware that "NMPC transformers were typically

characterized by the presence of Aroclor 1260."  Id. ¶ 16.

Ludlam opines that DVL's response to the contamination of the DVL Site was consistent

with DEC Rules and Regulations and the National Contingency Plan.  See generally, Ludlam I Decl;

see id. ¶¶ 27-31.  In his Supplemental Declaration, Ludlam asserts that the correct characterization

of the actions taken by DVL in response to the discovery of PCB contamination on the DVL Site is

"removal" rather than "remedial" in nature, and such removal actions were "necessary and proper"

in light of DEC criteria and assessment of the contamination.  Ludlam II ¶ 7.  Ludlam describes his

own issuance of a "no further action letter" after DVL took its initial clean-up actions, and then

describes his "understanding" of further actions and investigations taken by DVL following in a

13

second-stage cleanup.  Ludlam assesses the results of those investigations in light of DEC clean-up standards and Regulations.  He notes that "[i]t was of no significance that the further sampling was performed in the context of a possible transaction on the property" and that "[t]here was no need for undertaking a formal public review and comment period . . ."  Id. ¶¶ 7-10.  Ludlam compares the clean-up activities DVL undertook with those taken in other contaminated sites the Fort Edwards/Hudson Falls area where the PCB contamination was caused by GE.  Id. ¶¶ 10-11.  Defending his conclusion that GE is the responsible party for contamination at the DVL Site, Ludlam states that GE's claim groundwater sampling indicates that the soil contamination at the DVL Site is not attributable to GE is incorrect, and that the groundwater results only indicate that groundwater flow from the GE plant site has not impacted groundwater quality at DVL.  He then opines that "the reports of waste capacitors at the DVL Site are consistent with GE's historic practice of disposing waste capacitors at other locations in the Fort Edward area."  Id. ¶ 14.

Ludlam reiterates his conclusion that NMPC is also a responsible party, noting that there is no significance in GE or NMPC's not being named in the DEC Report as a potentially responsible party.  Id. ¶ 16.  He then states his objections to the claims he understands NMPC has made in its defense.  Ludlam emphasizes that his conclusion that NMPC is indeed a responsible party is based on the presence of Aroclor 1260 which, while used in various applications, "based upon [his] knowledge and experience at DEC, the most common usage of Aroclor 1260 was in electrical transformers.  NMPC was the electrical service provider in the area . . . . Given the reports of the historical presence of waste transformers at the DVL Site, the conclusion which [he] reached was that the Aroclor 1260 contamination was attributable to NMPC."  Id. ¶ 22.

First, the Court finds that Ludlam's Declarations constitute expert testimony.  Many of the

"observations" and essentially all of the "conclusions" that Ludlam offers are not rationally based on his first hand perceptions, but are rather based on scientific, technical, or specialized knowledge. Ludlam's employment at DEC undoubtedly exposed him to first-hand knowledge about many aspects of the PCB contamination of the DVL Site and other sites in the area.  However, DEC did not conclude that GE or NMPC was the origin of the PCB contamination at the DVL Site.  See DEC Report at 3-19, 3-20, 4-1.  Hence, Ludlam cannot (and does not) now testify that he observed, first-hand facts that would reasonably lead him to the conclusions he draws in his Declarations.  DVL offers Ludlam's Declarations not as an account of his personal role in the clean-up effort or his personal knowledge of the source of the PCBs; rather, Ludlam's testimony offers the opinion of a highly qualified individual drawing upon his expertise to reach conclusions surpassing his own experience of the events at issue.  Accordingly, his Declarations must be construed as offering expert testimony not properly disclosed.  This finding is true for all of Ludlam's initial conclusions and determinations, Ludlam I Decl. ¶¶ 27-31, with the exception of his first-hand observation of "instances during which ponding or flooding took place in the area of the south parking lot [of the GE Site], which resulted in the flow or migration of water across Upper Broadway to the present DVL Site."[4]  Id. ¶ 30(d).

Other aspects of Ludlam's Declarations, for example his familiarity through his professional experience with GE's historical disposal practices, his providing a copy of the DEC Report to DVL, etc. are proper lay witness opinion.  However, many of his statements, including his "conclusions" and "determinations," are not.  Ludlam's Supplemental Declaration, makes this finding inescapable,

---

[4] In recalling this factual observation, Ludlam does not claim to know whether the ponding water contained PCBs.

as it presents testimony and legal conclusions greatly exceeding the bounds of lay testimony.

DVL contends that it was not required to provide any disclosure with regard to Ludlam because (a) he was not a retained expert, and (b) the disclosure of Ludlam as a lay witness with knowledge of the remedial actions undertaken by DVL were sufficient to give Defendants notice and opportunity to depose Ludlam or prepare a defense against his presumed testimony. DVL Mem. in Opp'n to GE Mot. to Strike (Dkt. No. 55-2) at 2-6. These arguments are without merit. First, as noted, Rule 26(a)(2)(A)'s requirement that a party disclose the identity of all experts witnesses it may use to present evidence is distinct from the additional requirement in Rule 26(a)(2)(B), which requires the disclosure of written reports only from experts retained for the purpose of the litigation. FED. R. CIV. P. 26(a)(2); Lamere, 2004 WL 1592669, at *1. DVL did not identify Ludlam as an expert as required by Rule 26(a)(2)(A).

The fact that DVL disclosed Ludlam as a possible lay witness does not cure this oversight. Ludlam was identified as a DEC employee with knowledge of the DEC environmental investigation and the remediation actions taken by DVL, see Engel Decl., Exs. A-B (Dkt. No. 55). This however, is insufficient to put Defendants on notice that Ludlam, one among many potential fact witnesses, would testify as to conclusions drawn separately and distinct from those drawn by DEC in its Report. That is, given that the DEC Report did not identify the source of the PCB contaminants, naming Ludlam as a DEC employee with knowledge of the environmental investigation would not alert the Defendants to the possibility that he might testify as to conclusions contrary to the findings of that investigation.

Because DVL did not properly disclose Ludlam as an expert and only provided his

Declarations after the close of discovery,[5] GE and Niagra Mohawk did not have the opportunity to anticipate, challenge, or counter Ludlam's statements, assessments, methods, or conclusions.[6] Admitting the Ludlam Declarations for the purpose of the Court's determination of the various summary judgment Motions would greatly prejudice the Defendants.

The Court recognizes that Ludlam's testimony is extremely important to DVL's case, and it agrees with the Magistrate Judge's assessment that expert witness testimony in this case is "essential." Dkt. No. 37. Yet, DVL did not secure any expert testimony aside from Ludlam's, which it did not disclose as such. Despite the recognized importance of Ludlam's testimony, the exclusion of that testimony results wholly from DVL's own failures – despite the multiple extensions the Magistrate Judge granted it – to secure and disclose its experts. None of the Defendants did anything to prevent DVL from timely disclosing Ludlam or any other source as an expert; nor was Ludlam unknown or unavailable to DVL. Rather, having been warned of the need for expert support and knowing of an available source for that support, DVL failed to meet the minimum requirements of Rule 26(a)(2)(A). As a result, the Court refuses to consider the Ludlam Declarations and grants GE's Motion to strike that testimony.

## C. Declarations of Mark Millspaugh

DVL supplemented its Opposition to Defendants' summary judgment Motions with a

---

[5] DVL twice sought and was granted discovery deadline extensions for providing expert disclosures. See July 22, 2009 Order (Dkt. No. 37) (granting Plaintiff a second "lengthy extension" for expert disclosure after noting that expert witnesses will be "essential in this case" and warning that no further extensions will be granted to Plaintiff).

[6] Because Ludlam was not retained for the purpose providing expert testimony, DVL was not required to disclose a Rule 26(a)(2)(B) written report; it was, however, required to disclose his identity as an expert. See Lamere, 2004 WL 1592669, at *1.

Declaration from Mark Millspaugh, a former DEC employee and current President of an engineering firm.  Millspaugh Decl. (Dkt. No. 53-3).  Mr. Millspaugh describes "matters in which [he] was professionally involved during [his] employment with DEC," including his work on the "Wallace Site" and other PCB contaminated sites located throughout New York.  Id. ¶ 5-10.  Based on that professional experience, Millspaugh states that he is "familiar with the historic practices of both the NMPC and GE with respect to the handling and disposal of PCB-containing wastes and materials . . . ."  Id. ¶ 12.  Millspaugh rejects any assertion that NMPC conveyed all of its retired transformers to the Wallace or Cobleskill sites, where the PCB contents were "stripped out."  Id. ¶¶ 13-14.  He attests to the fact that PCBs of NMPC and GE origin were present at multiple disposal sites in Eastern New York.  Id. ¶ 15.  He adds that "it was GE's practice to dispose of PCB materials and items by conveying such materials an items into the scrap or salvage market.  GE also conveyed PCB fluids for use by third parties . . . ."  Id. ¶ 16.

DVL filed the Millspaugh Declaration on March 16, 2010, the same date that GE filed its Motion to strike the Ludlam I Declaration.  Understandably, GE's Motion to strike does not address the Millspaugh Declaration; in its Reply to DVL's Response in opposition to that Motion GE asks the Court to strike Millspaugh's Declaration.  Dkt. No. 61 at 7-9.  In that Reply, GE argues that Millspaugh's Declaration should be struck as (1) Millspaugh was never identified as any kind of witness, lay or expert, in DVL's disclosures and (2) Millspaugh's Declaration constitutes improper expert testimony.

To prevent unfairness to the litigants, courts apply a general rule that "new arguments may not be made in a reply brief."  Ernst Haas Studio, Inc. v. Palm Press, Inc., 164 F.3d 110, 112 (2d Cir. 1999) (citing Knipe v. Skinner, 999 F.2d 708, 711 (2d Cir. 1993)); see also Shanks v. Village of

Catskill Bd. of Trs., 653 F. Supp. 2d 158, 165 (N.D.N.Y. 2009).  Accordingly, the Court will not

consider GE's argument that the Millspaugh Declaration should be struck since that argument was

made in a reply brief.  The Court acknowledges that GE could not have known of Millspaugh's

Declaration when it initially filed its Motion to strike, but it could have requested leave to amend

that Motion or made a separate motion on this issue.  As it stands, DVL has not been afforded an

opportunity to respond to GE's arguments.  The Court, therefore, shall not strike the Millspaugh

Declaration.


## IV.    SUMMARY JUDGMENT

### A.  Standard of Review

The Second Circuit "recognize[s] in CERCLA's context that summary judgment is a

'powerful legal tool[ ]' that can 'avoid lengthy and perhaps needless litigation.'"  B.F. Goodrich v.

Betkoski, 99 F.3d 505, 521 (2d Cir. 1996) (quoting United States v. Alcan Aluminum Corp., 990

F.2d 711, 720 (2d Cir. 1993)).  Courts adjudicate motions for summary judgment in the CERCLA

context under the same standard as in any other case.  Id.

Federal Rule of Civil Procedure 56 provides that summary judgment is proper when "the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled  to a judgment as a matter of law."  FED. R. CIV. P. 56(c); Miller v. Wolpoff &

Abramson, L.L.P., 321 F.3d 292, 300 (2d Cir. 2003).  A fact is material only if it "might affect the

outcome of the suit under the governing law."  Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248

(1986); Byrnie v. Town of Cromwell Bd. of Ed., 243 F.3d 93, 101 (2d Cir. 2001).

19

The burden rests on the movant to demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In deciding whether the movant has met that burden, the court resolves all ambiguities and draws all permissible factual inferences in the light most favorable to the non-moving party. See Liberty Lobby, 477 U.S. at 255. If the moving party meets its initial burden, the non-moving party must go beyond the pleadings and to "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Corp., 475 U.S. 574, 586 (1986). "The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998).

"[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). Summary judgment is therefore appropriate "only when no reasonable trier of fact could find in favor of the nonmoving party." Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991). Thus, in the CERCLA context, "[s]ummary judgment is only proper when a defendant establishes it is not liable at all under CERCLA -- namely, it is not a PRP under the statute, there is no plausible evidence that it discharged hazardous materials, or it is eligible for one of the three affirmative defenses available under § 107." Niagra Mohawk Power Corp. v. Chevron U.S.A., Inc., 596 F.3d 112, 132 (2d Cir. 2010) (citing 42 U.S.C. § 9607(b)).

**B. CERCLA**

Congress enacted CERCLA to "assur[e] that those responsible for any damage, environmental harm, or injury from chemical poisons bear the costs of their actions." S. Rep. No. 96-848, at 13 (1980). A broad remedial statute, CERCLA "is designed to encourage prompt and effective cleanup of hazardous waste sites." Niagra Mohawk, 596 F.3d at 120 (citing B.F. Goodrich Co. v. Murtha, 958 F.2d 1192, 1197-98 (2d Cir. 1992)). Under CERCLA, "property owners are strictly liable for the hazardous materials on their property, regardless of whether or not they deposited them there." Id. (citations omitted). Owners can avoid liability under the statute only if the pollution results from an act of God or an act of war, or if they establish they are "innocent owners." 42 U.S.C. § 9607(b). However, CERCLA allows owners of polluted property to seek reimbursement from another "potentially responsible party" ("PRP"). 42 U.S.C. § 9607(a). A party will qualify as a PRP if it falls into any of the four categories provided for under the statute, namely:

(1) the owner and operator of a vessel or a facility,
(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance . . . .

42 U.S.C. § 9607(a).[7]

Under CERCLA, traditional causation principles are "relaxed" such that the party seeking costs need not show that a specific PRP's waste caused the incurrence of cleanup costs. Niagra

_____

[7] For purposes of CERCLA, the term "person" includes a corporation or commercial entity. 42 U.S.C. § 9601(21).

Mohawk, 596 F.3d at 130.   Rather, the party seeking costs need only show, that "'there was a release or threatened release, which [ ] caused incurrence of response costs, and [ ] that the defendant generated hazardous waste at the cleanup site.  What is not required is that the government [or another authorized party] show that a specific defendant's waste caused incurrence of cleanup costs.'"  Id. (quoting Alcan, 990 at 721) (alterations in original).  CERCLA thus "relaxes" but does not eliminate the causation requirement: a plaintiff need not show a causal link between that particular waste and the response costs the plaintiff incurred, but it must demonstrate that a defendant deposited hazardous waste at the site in question.  New Jersey Tpk. Auth. v. PPG Indus., Inc., 16 F. Supp. 2d 460, 469 (D.N.J. 1998) (citing Town of New Windsor v. Tesa Tuck, Inc., 935 F. Supp. 300 (S.D.N.Y. 1996)).

Before a qualifying PRP may be found  liable, the property owner must further establish that the clean-up site is a "facility" as defined by 42 U.S.C. § 9601(9);[8] there is a release or threatened release of hazardous substances at the facility; plaintiff has incurred costs responding to that release or threatened release; and those incurred costs conform to the National Contingency Plan ("NCP").  Prisco v. A&D Carting Co., 168 F.3d 593, 602-03 (2d Cir. 1999); Alcan, 990 F.2d at 719-20; 42 U.S.C. § 9607(a)(4).

Because in certain circumstances "available evidence of who did what at the relevant site is often dependent on inference[, w]hen determining CERCLA liability, 'there is nothing objectionable in basing findings solely on circumstantial evidence, especially where the passage of time has made direct evidence difficult or impossible to obtain.'"  Id. at 131 (quoting Franklin Cnty. Convention

---

[8] A "facility" includes "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located."  42 U.S.C. § 9601(9)(B).

Facilities Auth. v. Am. Premier Underwriters, Inc., 240 F.3d 534, 547 (6th Cir. 2001).  Thus, "CERCLA liability may be inferred from the totality of the circumstances as opposed to direct evidence."  Id. at 136.

### C.  DVL's Motion for Partial Summary Judgment

#### 1. Defendants' Liability Under CERCLA

DVL moves for partial summary judgment as to the liability of GE and NMPC under CERCLA for the contamination at the DVL site.  See generally DVL's Mem. in Supp. Mot. for Partial Summ. J. (Dkt. No. 40-14) ("DVL's Summ. J. Mem.").  DVL asserts that GE and NMPC qualify as PRPs under 42 U.S.C. § 9607(a)(3) as arrangers for disposal of a hazardous substance. DVL contends that this conclusion is amply supported by the following: 1) PCB wastes are hazardous substances under CERCLA; 2) GE and NMPC historically discarded or conveyed for disposal PCB-containing wastes;[9] 3) that GE and NMPC intentionally disposed of PCB wastes on the DVL site; 4) the DVL Site qualifies as a facility as the PCB contamination on that Site attests to the fact that hazardous substances were deposited, stored, disposed of, or placed, or otherwise come to be located there; 5) that DVL incurred costs related to the past release and presence of PCBs at the DVL Site; and 6) that DVL's costs and response were consistent with an conformed to the NCP.

Assuming arguendo that DVL has made a prima facie case with regard to the other elements, it has clearly failed to do so with regard to point three above.  To make a prima facie case that GE and/or NMPC qualifies as an "arranger" under CERCLA §107(a)(3), DVL must show that one or both "by contract, agreement, or otherwise arranged for disposal or treatment, or arranged

---

[9] Per the above discussion, the Millspaugh Declarations and admissible portions of the Ludlam Declarations support this statement.

with a transporter for transport for disposal or treatment, of hazardous substances . . . ."  See 42

U.S.C. § 9607(a)(3).  While "CERCLA does not specifically define what it means to 'arrang[e] for'

disposal of a hazardous substance . . . . under the plain language of the statute, an entity may qualify

as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous

substance."  Burlington Northern and Santa Fe Ry. Co. v. United States, __ U.S. __, 129 S. Ct.

1870, 1879 (2009) (citations omitted).  DVL attempts to show Defendants intentionally disposed of

hazardous substances first by citing Mr. Prevost's description of seeing PCB wastes of GE and

NMPC origin found on the Caputo Garage on the present day DVL Site.  Mem. in Supp. DVL Mot.

(Dkt. No. 40-14) at 5.  Mr. Prevost describes no such thing.

　　　With regard to GE, Mr. Prevost states only that a GE facility is nearly adjacent to the DVL

Site and that "[i]t is his understanding and knowledge that electrical capacitors were manufactured

at the GE facility."  Prevost Decl. ¶ 5.  Prevost recounts his seeing "objects which [he]

understand[s] to be electrical capacitors" which were "gray in color" and "part of the apparent scrap

or salvage operations at the Caputo property."  Id. ¶ 8.  Contrary to DVL's assertion, he does not

assert that these capacitors came from GE or contained PCB wastes.

　　　DVL's claim that Mr. Prevost's Declaration confirms the Niagra Mohawk origin of PCB

waste on the DVL site is also incorrect.  Mr. Prevost states only that he observed "[v]arious types of

discarded equipment and other items" on the property, including "large 'bucket' objects" that he

believes were electrical transformers and that those transformers look virtually identical to

transformers that Niagra Mohawk owns.  Prevost Decl. ¶ 7.  However, Mr. Prevost affirms that he

has "no personal knowledge of the source of the transformers I observed on the [DVL] Site" and

that the objects he remembers seeing on the DVL Site "did not bear Niagra Mohawk's name, initials

24

or any other symbols or logos indicative of Niagra Mohawk ownership or sourcing."  Prevost Aff. ¶¶ 4-5.

DVL also claims that "given GE's historical practices with respect to its disposition of PCBs and PCB wastes, there is no question that GE intended to dispose of PCBs which were present at the DVL site. . . . Likewise, NPMC's historical practices prior to 1979 establish that NMPC intended to dispose of wastes containing PCBs "  Mem. in Supp. DVL Mot. at 6.  This assertion overstates CERCLA "arranger" liability.  Assuming the truth of DVL's historical practices claims, DVL utterly fails to meet its burden of linking either Defendant's alleged disposal of or intent to dispose of PCBs to the DVL site.  See Alcan, 990 F.2d at 721 (to prove CERCLA "arranger" liability, a plaintiff must show, *inter alia*, "that the defendant generated hazardous was *at the clean-up site*") (emphasis added); New Jersey Tpk. Auth., 16 F. Supp. 2d at 469 ("it is not enough that [the plaintiff] simply prove that each [] Defendant produced [hazardous waste] and that [waste] was found at each of the sites in question and ask the trier of fact to supply the link.  Rather, in order to prevail, it must prove that each Generator Defendant deposited (or caused to be deposited) [the waste] at each of the sites in question") (citing *inter alia* Tesa Tuck, Inc., 935 F. Supp. at 304) aff'd 197 F.3d 96, 108-109, 112 (3d Cir. 1999) (evidence that merely "presents probabilities rather than proof," "relies upon a collection of facts that could be summarized as 'if it is there, it must be theirs,'" or is "vague and imprecise, of questionable reliability, and therefore not sufficiently probative to create an issue for trial" is insufficient to hold a party liable under CERCLA); see also Dana Corp. v. Am. Standard, Inc., 866 F. Supp. 1481, 1493 (N.D.Ind. 1994) ("To establish CERCLA liability, the plaintiffs must prove . . . that each defendant's waste was disposed of at the Site") (footnote omitted).

None of the "historical practices" referenced by DVL evinces any Defendant's disposal or intent to dispose of hazardous waste *at the subject property*.  DVL has not presented additional evidence, including the Prevost testimony, that shows that no issue of material fact exists as to this issue and to Defendants' classification as "arrangers" under § 9607(a)(3).  Viewed in the light most favorable to Defendants, Plaintiff's submissions fail to meet the standard required to sustain a grant of summary judgment as to Defendants' liability under CERCLA.

*2.  Defendants' Liability Under the Principle of Common Law Indemnity*

The above discussion demonstrates that DVL is unable to establish Defendants' culpability as a matter of law.  This finding compels the denial of DVL's Motion for summary judgment under common law indemnification.  See, e.g., Rogers v. Dorchester Assocs., 32 N.Y.2d 553, 561-63 (1973) (evidence of negligent performance related to the injury is required for liability to attach to the party charged with a duty to indemnify).

Additionally, insofar as DVL's indemnification claim seeks damages, the relief sought is for the same damages specified in its CERCLA claim.  Compare Compl. ¶¶ 37-41 with id. ¶¶ 31-36.  CERCLA "precludes 'recovering compensation for the same removal costs or damages or claims' under both CERCLA and state or other federal laws."  State of New York v. Shore Realty Corp., 759 F.2d 1032, 1041 (2d Cir. 1985) (citing 42 U.S.C. § 9614(b)).  Accordingly, the Second Circuit has ruled that CERCLA preempts state law indemnification claims.  Niagra Mohawk, 596 F.3d at 139 (citing Bedford Affiliates v. Sills, 156 F.3d 416, 427 (2d Cir. 1998)).  Hence, DVL's Motion for summary judgment is denied as to DVL's indemnification claim.

**D.  General Electric and Niagra Mohawk Defendants' Motion for Summary Judgment**

*1.  CERCLA Liability*

26

GE and the Niagra Mohawk Defendants both move for summary judgment as to DVL's CERCLA claim against them.  Dkt. Nos. 38, 44.  Their arguments essentially mirror those used to defend against DVL's Motion, focusing primarily on the lack of evidence that would qualify them as PRPs under CERCLA and on DVL's failure to conform to the NCP.  In addition to the arguments that it made in support of its own Motion for summary judgment as to CERCLA liability, DVL asserts that the circumstantial evidence surrounding this case raise issues of triable fact as to GE and NMPC's qualifying as PRPs with regard to the DVL Site.  Because the Court finds that DVL has failed, as a matter of law, to establish that Defendants qualify as PRPs, it grants Defendants' Motions without reaching the issue of whether DVL's conduct conformed to the NCP.

       *a.  General Electric*

GE supports its Motion for summary judgment by noting that the only potentially applicable PRP categories provided for under 42 U.S.C. § 9607(a), is arranger.  GE Mem. in Supp. Mot. for Summ J. (Dkt. No. 38-2) at 7-8.  It then points to the lack of any evidence linking its activities to the DVL Site, focusing on the inconclusive DEC Report, the negative results from the monitoring wells, the absence of any expert opinion as to GE's being the source of contamination, and the immateriality of the Prevost testimony.  Id. at 7-12.

DVL's response to both GE's Motion and the Niagra Mohawk Defendants' Motion largely rests on its assertion that sufficient circumstantial evidence exists to raise issues of material fact as to Defendants' responsibility under CERCLA's relaxed causation requirement.  However, DVL has failed to provide any evidence of a nexus between any Defendant's waste and the contamination at the DVL site; it has therefore failed to establish Defendants' liability as PRPs under CERCLA.

DVL's CERCLA claim against GE appears to rest largely on the fact that GE owns the property adjacent to the DVL Site; the soil on that property is PCB-contaminated; Mr. Ludlam observed surface water migration from the GE Fort Edwards property to the DVL Site; Mr. Prevost remembers seeing what he believed were electrical capacitors on the subject property when it housed the Caputo Garage; the PCBs contaminating the subject property match those used at GE's Fort Edwards Site; and GE's history of unsafe PCB disposal practices.  Mem. in Resp. to Defs.' Summ. J. Mot. (Dkt. No. 53) ("DVL's Opp'n Mem.") at 4-5.  Crucially, however, DVL is unable to support its claim that GE is a PRP with evidence that GE deposited, or arranged to have deposited, PCB contaminated wastes on the DVL Site.

DVL does not know of hazardous materials of GE origin at the DVL Site.  GE was not identified as a source of contamination in the DEC Report, nor has any GE material been identified during the removal or remediation activities taken since the issuance of that Report.  The monitoring wells that GE installed to determine whether there was any migration of contamination from the GE Property to the other areas including the DVL Site have always tested negative.  Mr. Prevost's accounts do not identify GE as the source of the material that he saw at the Caputo Garage.  Mr. Ludlam's account of water flowing from the GE Property to the DVL Site is insufficient to establish GE as a PRP without evidence that the water contained PCB contaminants.  Finally, GE's activities at other sites cannot substitute for evidence of its activities in relation to the property involved in this dispute.  See New Jersey Tpk. Auth., 16 F. Supp. 2d at 469.  Without providing any evidence that GE disposed of hazardous substances at the relevant site, DVL thus fails to satisfy even the relaxed liability standard under CERCLA.

DVL looks for support in the Second Circuit's ruling in Niagra Mohawk Power Corp. v. Chevron U.S.A., Inc., 596 F.3d 112 (2d Cir. 2010) that direct evidence linking a defendant to a hazardous waste site is not necessary to avoid summary judgment in CERCLA cases. DVL's Opp'n Mem. at 2. It then asserts that the circumstantial evidence in this case is sufficient to establish, or at least raise issues of triable fact, as to Defendants' CERCLA liability for the DVL Site. Id. DVL mischaracterizes the Second Circuit's holding. First, in Niagra Mohawk, the court found summary judgment was inappropriately granted because each of the defendants either owns or previously owned the contaminated property (King, Chevron, U.S. Steel) or conducted operations that evidence in the record showed were specifically related to the pollution at the relevant site (Portec). 596 F.3d at 132-36. Second, while the determination that U.S. Steel was liable as a PRP based on its prior ownership of the contaminated land was "inferred from the totality of the circumstances as opposed to direct evidence," the circumstances supporting that finding are quite different from those presented here. U.S. Steel and its predecessor were, indisputably, former owners of the relevant property. The Second Circuit based its holding on this ownership, rather than on the alternative theory of arranger liability. Id. at 135-36. Direct evidence of U.S. Steel or its predecessor's alleged dumping was unavailable, in part, because that ownership occurred approximately 100 years prior. Nevertheless, certain experts evaluating the circumstantial evidence concluded that U.S. Steel did contribute to the deposit of the hazardous waste; under these circumstances, the court found that expert testimony was sufficient to preclude summary judgment.

GE, unlike U.S. Steel, has never owned the subject property at issue here. The length of time that has passed since GE's allegedly violative acts occurred is much shorter than in the case of U.S. Steel. More importantly than the difference in duration, DVL has not provided any expert to

evaluate whatever circumstantial evidence might exist.  In fact, DVL's defends the Ludlam materials against GE's Motion to strike, in part by contending that those materials are not expert testimony, see generally Engel Decl. (Dkt. No. 55); DVL Mem. in Opp'n to GE Mot. to Strike (Dkt. No. 55-2); to the extent they are expert opinion, that material is stricken, see supra sec. III.B.

GE's position is also dissimilar to that of defendant Portec in the Niagra Mohawk case.  Id. at 134-35.  The Second Circuit found that summary judgment in favor of Portec was inappropriate in light of the latter's status as an "operator."  Id.  The court determined that Portec qualified as a PRP because "there is evidence that Portec's activities on its property resulted in hazardous waste deposits. . . . More importantly . . . there is evidence that these hazardous deposits made their way into the [ ] Creek" which, "in turn, passed through" the contaminated property.  Id. at 135.  Evidence showed that the creek left behind hazardous materials, and experts opined that these materials originated at the Portec plant.  Id.

In the instant action, there is evidence that GE's site was contaminated.  The comparison with Portec, however, ends there.  DVL offers no evidence that the deposits on GE's land made their way down to the DVL Site.  The DEC Report, which looked into exactly this issue, found the source of the DVL Site contamination to be "unknown."  Ludlam testified that he saw surface water migrate from the GE Site to the DVL Site, but he does not assert it was PCB contaminated.  Again, DVL has not presented an expert to opine that it was and that this migration of surface water explains the contamination at the DVL Site..  In the absence of eyewitness testimony or other direct evidence, and without expert opinion linking GE to the contamination at the DVL Site, the circumstantial evidence DVL cites does not provide the Court with a basis for denying GE's Motion for summary judgment.

"Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.  As the above discussion indicates, DVL has failed to make a showing sufficient to establish an essential element of its CERCLA claim, namely GE's qualifying as a PRP with regard to the DVL Site.  Accordingly, GE's Motion for summary judgment is granted as to DVL's cause of action under CERCLA.

### b. Niagra Mohawk Defendants

DVL also fails to show any nexus between the Niagra Mohawk Defendants' activities and the DVL Site.  The evidence does not suggest any Niagra Mohawk transformers went to the DVL Site; while it does not foreclose that possibility, the only evidence as to the disposal practices of NMPC suggests that most of the waste went to the Wallace Site, and that Wallace is the only identified vendor receiving NMPC's retired transformers from the Eastern Division.  Abdullah Aff., Ex. J.  While Mr. Millspaugh disputes this claim, see Dkt. No. 53-3 ¶ 12, he does not claim to know whether any retired NMPC transformers went to the DVL Site.  Mr. Prevost does not attest to the fact that the transformers he saw on the DVL Site were NMPC transformers; he does not know the source of those transformers nor know of NMPC's practices regarding transformer disposal and handling.  Prevost Decl. ¶ 7; Prevost Aff. ¶¶ 4-5.  Accordingly, Mr. Prevost's testimony does not link the Niagra Mohawk Defendants to the DVL Site.

Mr. Ludlam's testimony also fails to show a nexus between NMPC and the DVL Site.  First, while the Court has considered Mr. Ludlam's statements that Aroclor 1260 was found on the DVL Site, that NMPC transformers employ that Aroclor, and that NMPC is the service provider in the

31

area where the DVL Site is located, his conclusion that NMPC is a responsible party is mere conjecture.  Mr. Ludlam has no personal knowledge of NMPC transformers being disposed on the DVL Site; the DEC investigation for which Mr. Ludlam held responsibility did not suggest NMPC was a responsible party, nor did it uncover any debris that was later linked to NMPC.  In sum, the Ludlam materials cannot support DVL's CERCLA claim against the Niagra Mohawk Defendants.

Finally, as with GE, the Second Circuit's holding in <u>Niagra Mohawk</u>, 596 F. 3d 112, does not compel this Court to deny the Niagra Mohawk Defendants' Motion.  Rather, the Court finds that summary judgment is appropriate because DVL has failed to present evidence suggesting any of the Niagra Mohawk Defendants' qualify as a PRP.  Without making out this essential aspect of its CERCLA claim, that claim fails as a matter of law.

### 2. Indemnification claim

For the reasons expressed above in denying summary judgment in favor of DVL as to its indemnification claim, *supra* sec. IV.C.2., Defendants are entitled to summary judgment on this claim.

### 3. Trespass and Nuisance Claims

DVL additionally seeks damages and injunctive relief under the theories of continuing trespass and nuisance claims.  Compl. ¶¶ 41-53.  Section 214-c of the New York Civil Practice Law and Rules provides, in relevant part,

> the three year period within which an action to recover damages for personal injury or injury to property caused by the latent effects of exposure to any substance or combination of substances, in any form, . . . upon or within property must be commenced shall be computed from the date of discovery of the injury by the plaintiff or from the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff, whichever is earlier.

N.Y. C.P.L.R. 214-c(2).

The New York Court of Appeals has held that, as to claims for damages, section 241-c contains "no continuing-wrong exception to its new comprehensive, across-the-board rules." Jensen v. Gen. Elec. Co., 82 N.Y.2d 77, 88 (1993). Plaintiff became aware of the contamination at least by August 2004. See Carames Decl. ¶¶ 12-13. Yet it did not file its Complaint until October of 2007. Dkt. No. 1. Accordingly, insofar as Plaintiff seeks damages pursuant to its trespass and nuisance claims, those claims are untimely under the three year statute of limitations provided by N.Y. C.P.L.R. § 214-c, and summary judgment in favor of Defendants is warranted. See Bano v. Union Carbide Corp., 361 F.3d 696, 709 (2d Cir. 2004); Niagara Mohawk Power Corp. v. Consol. Rail Corp., 291 F. Supp. 2d 105, 138 (N.D.N.Y. 2003) *overruled on other grounds*; Incorporated Vill. of Garden City v. Genesco, Inc., No. 07-CV-5244, 2009 WL 3081724, *7 (E.D.N.Y. Sept. 23, 2009). Moreover, even as to the injunctive relief sought, these claims fail as a matter of law because, as explained, DVL cannot establish the culpability of any Defendant for contaminating the DVL Site. The Court, therefore, grants summary judgment to Defendants as to all of DVL's state law claims.


**V.      CONCLUSION**

Based on the foregoing discussion, it is hereby

**ORDERED**, that Defendant General Electric Company's Cross-Motion to strike (Dkt. No. 52) is **GRANTED** consistent with this opinion; and it is further

**ORDERED**, that Plaintiff DVL, Inc.'s Motion for partial summary judgment (Dkt. No. 40) is **DENIED**; and it is further

**ORDERED**, that Defendant General Electric Company's Motion for summary judgment (Dkt. No. 38) is **GRANTED**; and it is further

**ORDERED**, that Defendants National Grid, National Grid USA, National Grid USA

Service Company, Inc., Niagara Mohawk Power Corporation's Motion for summary judgment (Dkt.

No. 44) is **GRANTED**; and it is further

**ORDERED**, that the Clerk serve a copy of this Order on the parties.

**IT IS SO ORDERED.**

DATED:        December 6, 2010
              Albany, New York

_____
        Lawrence E. Kahn
        U.S. District Judge